<u>NOT FOR PUBLICATION</u>

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DARON JOSEPHS,             :
a/k/a DOMINIC GIBBS,      :
                           :   Civil Action No. 10-0753 (RMB)
          Petitioner,   :
                           :
          v.            :   **OPINION**
                           :
ROBERT A KIRKPATRICK, et al., :
                           :
          Respondents.   :

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>           Counsel for Respondents
Daron Josephs                 Nancy P. Scharff
Wende Correctional Facility    Camden Co. Prosecutor's Ofc.
Alden, NJ  14004           25 North Fifth Street
                              Camden, NJ  08102-1231

**BUMB**, UNITED STATES DISTRICT JUDGE:

    Petitioner Daron Josephs, a prisoner currently confined at the Wende Correctional Facility in Alden, New York, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Robert A. Kirkpatrick, the Commissioner of the New Jersey Department of Corrections, and the Attorney General of New Jersey.

    For the reasons stated herein, the Petition will be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the

Supreme Court of New Jersey.[1]

> The shootings that caused the deaths of [Leon]
> Mitchell, [Barrington] McLean, and [Christine] Williams
> on January 22, 1995, resulted from a dispute among
> brothers and friends involved in a marijuana
> distribution operation led by Emil Josephs. Emil lived
> in Camden in an apartment located at 3212 Federal
> Street. Residing with him at the time were his brother,
> Turan Josephs (TJ), and his friend Barrington McLean.
> The apartment occupied the second floor and attic of a
> house. On the second floor were two bedrooms, a
> kitchen, and one bathroom. McLean and TJ slept in the
> second floor bedroom located at the front of the house.
> Emil used the attic as his bedroom.

> Although drugs were not distributed from the
> apartment, Emil kept a quantity of marijuana in a
> compartment under the stairs leading to the attic.
> Significant amounts of cash also were kept in the house
> at times. The drug-dealing business had become very
> busy around the end-of-year holidays in 1994, taking in
> approximately $15,000 per week at the time of the
> shootings. Emil shared the profits with McLean and TJ,
> allowing them a one-third share to split between
> themselves.

> Sometime during December 1994, defendant (whose
> nickname is Dee) and Hugh Josephs Jr. (nicknamed
> Junior), Emil's half-brothers, moved into the apartment
> because they had agreed to install carpeting for Emil.
> It is noteworthy that defendant and Junior arrived in a
> red Honda Civic that they used while they remained at

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct.  The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

the apartment on Federal Street. In terms of familial relations, we also note that Emil, TJ, defendant, and Junior share the same father, Hugh Josephs Sr.; however, Emil and TJ have a different mother from defendant and Junior.

Junior was promised $2500, and defendant $1500, to lay the carpeting. Lacking sufficient cash to pay them in full, Emil compensated Junior and defendant with marijuana to sell. The profits from those sales were sufficient to serve as payment for the carpet work. Junior and defendant then stayed on at the apartment, joining Emil's marijuana distribution business by selling for him at a designated location. Emil also enlisted Leon Mitchell and Christine Williams to become involved in the business. They too stayed at the apartment on Federal Street.

Emil was the only person present in the apartment on the evening of Saturday, January 21, 1995, who testified at defendant's trial. Other than defendant, and Junior, whose whereabouts are unknown, all of the others present were killed. According to Emil's testimony, on that Saturday he learned from his friend, "Bloody" (a business associate in the marijuana business), that defendant and Junior were selling marijuana purchased from another source, and that they were selling the other drugs at Emil's sales location. Apparently, the two were pocketing the money from those sales. Selling marijuana purchased from another distributor was contrary to Emil's direct orders to defendant and Junior when he allowed them to deal drugs for him.

Emil returned to the apartment that evening to find McLean, Mitchell, defendant, and Junior sitting in the kitchen. He had directed defendant and Junior to leave their designated sales post and to meet him back at the apartment. Emil described himself as enraged because defendant and Junior had not followed his orders. He told them they were "out of the business." The heated verbal confrontation escalated as Junior and Emil began to scuffle. Brandishing a kitchen knife, defendant approached Emil from behind, but he was disarmed by McLean. Emil ordered Junior and defendant to leave his house, and then proceeded into their bedroom where he took a nine millimeter and .45 caliber gun from their bags and began to pack their clothes.

3

Mitchell interceded and persuaded Emil to let defendant and Junior stay for the remainder of the night because it was past midnight. Nonetheless, Emil took the two guns with him to the attic where he had a third gun, a .357. Normally, a gun would be kept under the kitchen sink for "emergencies."

Emil left his attic bedroom several times that night. The first time he took all three guns with him while he showered before retiring. Again, at approximately one in the morning he went downstairs to use the bathroom, that time taking only the nine millimeter. As he passed by, he saw defendant and Junior awake and sitting on the floor in the bedroom they were using. Emil then encountered McLean in the kitchen, awake and upset over the evening's events. Emil left the nine millimeter with McLean as a show of "respect." Emil did not want McLean to think that he intended to disarm him when all of the guns were moved to Emil's attic room.

Sometime between five and six o'clock in the morning, Emil, dressed only in a tee shirt, underwear, and slippers, went downstairs. He saw defendant and Junior fully dressed in their room as he again passed by. Emil proceeded to the kitchen where he met up with Mitchell and Williams. After a brief time, Mitchell left the room, leaving behind Williams and Emil. Not long thereafter, Junior came in the room. Emil testified that although he was not paying close attention to what Junior was doing, he was aware that Junior went by the sink and then left the room, walking in a hunched-over manner. As noted, a gun typically had been kept in the cabinet under the sink.

Junior then reentered the room, and Williams screamed as he pointed the nine millimeter gun at Emil and stated "What's up now?" Emil asked him if he was going to shoot. Junior proceeded to pull the trigger, but the gun did not fire. While Junior reloaded, Emil jumped through a kitchen window, breaking the glass as he did. He landed, bleeding, in an alley. His neighbors, Delores Morrison and Raymond Mann, were in the alley at the time. They heard the breaking glass and saw Emil covered with blood from gashes on his leg and arm. He told them that he was in a fight and that someone was trying to kill him.

4

According to Emil, as he ran away from his apartment, he heard three shots, a pause, and then additional shots. He stated that he believed the shots sounded as if coming from different guns. He ran back to his neighbors and asked them if they heard the shots. Morrison said that she did. She also gave him a towel from her laundry basket to wrap around his wounds. Morrison said that she was going to call the police and went inside. Emil waited a few moments, but when Morrison did not return, he left. Morrison emerged from her apartment not long thereafter and found that Emil had left. She then observed two men leave the front door of Emil's apartment. She described them as fair skinned, perhaps Asian, stocky, and of medium height. Compared to the man who jumped out of the window, whom she described as approximately her height, (5'5" or 5'6"), she assessed the other two men as a bit taller. She observed the two men walk down the sidewalk, turn the corner, and disappear.

Emil hitched a ride to the apartment of his friend, Bloody, who arranged for friends to take Emil to New York. Bloody then drove to Philadelphia Airport to pick up TJ and Lorna Palmer, who were returning from Texas with some marijuana for Emil. He dropped them off at Emil's apartment. We note here that Bloody died before trial and, therefore, we have only TJ's recitation concerning these events.

Because TJ had forgotten his keys, he rang the doorbell. When no one answered, Palmer left. TJ then proceeded to climb into the apartment through one of the two kitchen windows, noticing the broken glass on the ground below the windows. TJ found food cooking on the stove and then discovered that Mitchell, McLean, and Williams had been shot to death. Not wanting to be involved in the shootings, TJ removed his personal items from the apartment. He then reported the murders to the police by calling from a pay phone and by flagging down a patrol car. He also contacted a police officer he knew through a friend.

Upon arrival, the police found no sign of forced entry. The three bodies were found in different locations in the apartment. McLean's body was in the front bedroom. Williams's body was found in a crouched position in a corner of the bathroom. Mitchell's body was at the top of the stairs lying on a shower curtain

5

still attached to its rod that had been pulled from its
moorings.

### The Investigation and Arrest

Dr. Robert Catherman, a medical examiner for
Camden County, performed autopsies on all three
victims. The autopsy on McLean revealed that he had
been shot six times. The first bullet entered the top
right side of McLean's head at a sharp downward angle,
fracturing his skull and causing acute damage to his
brain. The second shot went through McLean's face,
obliterated his right eye, and exited through his left
cheek. It caused bruising to the adjacent lobes of
McLean's brain. The third shot entered the back of his
left thigh, pierced his scrotum, and then entered and
exited his right thigh. The fourth shot entered the
back of McLean's upper right thigh and cut through his
abdomen. That bullet ruptured his intestine, fractured
his right femur, broke his thigh bone, and damaged his
colon. The fifth and sixth shots entered and exited
McLean's right hand and appeared to be defensive
wounds. McLean also suffered eight blunt force
injuries, all of which were consistent with having been
inflicted by a steam iron. Four of the injuries were to
his hands and arms and appeared to be defensive wounds.
The other four injuries were inflicted to his head. The
head injuries went through the scalp and down to his
skull. They did not cause bone damage but may have been
sufficient to render McLean unconscious.

The cause of death for McLean was the combined
effects of the gunshot wounds that involved the head,
trunk, right and left legs, the right arm and hand,
and, to some extent, the blunt force injuries to his
head. The bullet from the first shot was recovered from
the base of McLean's skull and was identified as a .38
caliber class metal-jacketed lead projectile. The
bullet from the fourth shot was recovered from McLean's
abdominal wall and was identified as a nine millimeter
projectile. Two more bullets were embedded in the
carpet directly under McLean's body: a nine millimeter
projectile was found under McLean's lower chest, and a
.45 caliber projectile was found under McLean's lower
abdominal area. Also in the room were two discharged
nine millimeter cartridge cases, a discharged .45
caliber cartridge case, and a steam iron. The gunshot

6

wounds were all inflicted from a distance of a little
more than a foot and a half.

The autopsy on Mitchell revealed that he had been
shot four times. The first shot entered the left side
of the front of Mitchell's chest, shattered his spinal
column and cord, damaged his liver, stomach, duodenum,
and pancreas, and exited through the lower right side
of his back. The second shot went through his face and
bruised the lobes of his brain. The third shot went
through the left side of Mitchell's cheek, also bruised
the lobes of his brain, and exited through the jaw. The
fourth shot entered his lower lip, shattered his upper
jaw, and exited in front of his right ear. There was
stippling surrounding the second and third gunshot
wounds, indicating that they had been fired at close
range. Dr. Catherman found that the cause of Mitchell's
death was a combination of all four wounds. There were
three defects in the carpeting under Mitchell's body.
One of the defects, located under Mitchell's torso, was
caused by a projectile that was smaller than a .45
caliber projectile, such as a nine millimeter
projectile. The other two defects were under Mitchell's
head. They were caused by .45 caliber projectiles. The
lead core of a nine millimeter projectile was in
Mitchell's hair, near his fourth exit wound, and the
jacketing that had surrounded the lead core was in the
fourth exit wound.

The autopsy on Williams revealed that she had been
shot twice in the head. The first shot struck the
bridge of her nose, passed through her face, and exited
on the left side of her cheek. There was stippling
surrounding the entrance wound, suggesting that the
shot had been fired at close range. The second shot
entered through the top of Williams's head, passed
through her skull and brain, and proceeded on an
acutely downward angle through the base of the skull
and into the neck. The sharp downward angle of this
shot suggested that Williams's head had been flexed
against her chest, and that the gun had been pointed
directly at the top of Williams's head. This wound had
no evidence of residue and was fired from a distance of
at least a foot and a half. Two nine millimeter bullets
were recovered: one from her chest and the other near
her body in the bathroom. A discharged nine millimeter
Luger cartridge case also was found near her body.

Sergeant Gerald Burkhart of the New Jersey State Police, an expert in ballistics and firearms identification, determined that three different firearms were responsible for discharging the bullets and shells recovered from the scene and from the victims' bodies. The nine-millimeter-discharged bullets and shells had been fired from one gun, the .45-caliber-discharged bullets and shells had been fired from a second gun, and the .38-caliber-class-discharged bullet, recovered from the base of McLean's skull, had been fired from a third gun, possibly a .357 revolver. Concerning the discharged shells, Sergeant Burkhart testified that they fell into two distinct groupings indicating that they were fired from two guns. He also stated that there is a difference in how different guns sound when discharged.

During cross-examination of Detective Michael Aaron, it was revealed that some of the ballistic casings had been picked up by investigators with bare hands and that no effort was made to test the casings for fingerprints. Sergeant Burkhart did not test the projectiles for fingerprints either. Detective Aaron explained that the preferred method of testing for fingerprints could compromise the ballistics testing that connects ammunition and the gun from which it was fired. He stated further that he did not conduct any of the tests used to determine whether a victim handled or fired a weapon because those tests can yield a positive result when the victim was simply in the same room as a fired gun.

The police did not find useable latent fingerprints in the kitchen, bathroom, or third floor. No cash or firearms were found in the apartment. The police found another discharged nine millimeter cartridge case; a black leather jacket and an electronic organizer, both of which belonged to defendant; two battery operated digital scales; a white plastic bag filled with numerous small- and medium-sized transparent bags typically used for packaging controlled substances; a pillow with a bloody footprint on it in the attic; a knife sticking out from the top of a roll of carpet padding in the second floor hallway; a brown paper bag containing twenty-five small plastic bags filled with what appeared to be marijuana; and some drug ledgers in McLean's handwriting. Forensic tests confirmed that a window in the kitchen had been

broken from the inside and that there was human blood and flesh on the glass.

Fonceta Young was interviewed by the police. Young lived in the first floor apartment at 3212 Federal Street. She did not know the people who lived in the second-floor apartment. While she was watching television that morning, she heard "thumping" noises coming from the second floor apartment. She described the sound to be like "wrestling" or "playing." After about six or seven seconds of that noise, Young heard seven to nine "tapping" sounds. She thought her upstairs neighbors were having a "domestic argument." Approximately fifteen minutes after that noise ended, she heard the sound of footsteps running down the stairs from the second floor to the ground level. She also heard a man's voice saying, as if in a hurry, "Come on, Dee. Dee, come on."

Joyce Poole also was interviewed. Her home shared a common wall with the house located at 3212 Federal Street. Poole was upstairs when she heard what sounded like "bumping" noises coming from the other side of the common wall. She thought it was the sound of men fighting. She then heard sounds like a jack hammer coming from the apartment. The events she described lasted between ten and fifteen minutes.

Sandra Delgado lived across the street. Although she did not hear gunshots she heard the sound of shattering glass, and when she looked out her window she saw someone speaking to Morrison. She watched as Morrison handed something to the man. Delgado said she went back to bed not thinking that what she had witnessed was significant. Delgado did not know the people living at 3212 Federal Street, but on one occasion she had seen a stream of people, who drove luxury cars with out-of-state license plates, going in and out of the apartment.

At approximately 9:30 a.m. on the morning of the murders Detective Jeffrey Frampton and Officer Shane Sampson were on patrol in Camden. A red Honda Civic approached their car and then made a sudden stop. A black male, who appeared to be 5'6" or 5'7", got out of the car and fled into the neighboring town of Pennsauken. The driver of the Honda then proceeded at high speed in the wrong direction on a one-way street.

Frampton and Sampson activated their siren and pursued the Honda until another vehicle cut them off. Believing that they were pursuing a stolen vehicle, they radioed their fellow officers to watch for the Honda. Another unit found the car approximately fifteen minutes later, abandoned at a nearby street corner where it had struck a fire hydrant. The officers took down the vehicle information and impounded the car because it had not been reported as stolen.

The following month Emil returned to Camden and was apprehended by the police. He was interviewed and his wounds photographed. Charged as a fugitive from Texas, Emil was held in the Camden County Jail.

In early March 1995, police obtained arrest warrants for defendant and Junior and a search warrant for their mother's house in Brooklyn. When the search warrant was executed, the police found a letter from the City of Camden indicating that on January 22, 1995, a 1986 Honda Civic with New York license plates had been recovered in Camden and was being held by the Camden Police Department. They also found letters from the Camden County Prosecutor's Office to defendant and Junior, informing them that there were charges pending against them in Camden.

The police obtained a search warrant for the vehicle, which had been taken to a towing and salvage yard. On the seat, police found ignition keys, a large black leather hat, and a pair of sunglasses. No evidence of drugs, drug paraphernalia, or bloodstains were found. The hat was taken because it fit Morrison's description of the hats worn by the men she saw leaving 3212 Federal Street shortly after the shots were fired. Emil later identified the sunglasses as belonging to defendant, and the hat as belonging to Junior.

State v. Josephs, 174 N.J. 44, 66-75 (2002).

B.    Procedural History

On February 25, 1998, Camden County Indictment Number

803-02-98 charged Petitioner with the following offenses:

first-degree purposeful or knowing murder of Barrington McLean by

10

his own conduct, in violation of N.J.S.A. 2C:11-3a(1) and (2) (Count One); first-degree purposeful or knowing murder of Leon Mitchell by his own conduct (Count Two); first-degree purposeful or knowing murder of Christine Williams, not by his own conduct (Count Three); first-degree attempted murder of Emil Josephs, in violation of N.J.S.A. 2C:11-3a (Count Four); second-degree aggravated assault of Emil Josephs, in violation of N.J.S.A. 2C:12-1b(1) (Count Five); conspiracy to murder Emil Josephs, Barrington McLean, Leon Mitchell, and Christine Williams, in violation of N.J.S.A. 2C:5-2 (Counts Six, Seven, Eight, and Nine, respectively); second-degree possession of a firearm for an unlawful purpose, in violation of N.J.S.A. 2C:39-4a (Count Ten); and third-degree possession of a handgun without a permit, in violation of N.J.S.A. 2C:39-5b (Count Eleven).

Separate juries were empaneled for the guilt and penalty phases of Petitioner's trial.  By jury verdict, Petitioner was acquitted of the murder of Williams and the attempted murder and aggravated assault of Emil Josephs.  Petitioner was convicted of the capital murder of McLean and Mitchell, of conspiracy to Murder McLean, Mitchell, Emil, and Williams, of possession of a firearm for an unlawful purpose, and of unlawful possession of a handgun.

The penalty-phase jury determined that aggravating factors outweighed mitigating factors beyond a reasonable doubt.

11

Judgments of two capital convictions and two death warrants were filed on April 6, 2000.

On May 25, 2000, the trial court sentenced Petitioner on the remaining non-capital offenses to an aggregate consecutive sentence of ten years.

On direct appeal, the Supreme Court of New Jersey affirmed Petitioner's non-capital convictions and the judgment of conviction of purposeful or knowing murder.  The determination of murder by own conduct was reversed based on prejudicial error in the jury instructions.  The Supreme Court of New Jersey set aside Petitioner's death sentences and remanded for further proceedings.

In October 2002, Petitioner was re-sentenced to two consecutive life terms on Counts One and Two, with a thirty-year period of parole ineligibility for each.  Petitioner appealed these sentences and, on June 6, 2003, the Superior Court of New Jersey, Appellate Division, affirmed.

In October 2003, Petitioner filed a state petition for post-conviction relief, asserting various claims of ineffective assistance of trial counsel.  The trial court denied relief.  On February 23, 2009, the Superior Court of New Jersey, Appellate Division, affirmed the denial of relief.  State v. Josephs, 2009 WL 417297 (N.J.Super. App.Div. Feb. 23, 2009).  The Supreme Court

of New Jersey denied certification on July 10, 2009).  <u>State v. Josephs</u>, 200 N.J. 206 (2009).  This Petition followed.

Here, Petitioner asserts the following grounds for relief: (1) the trial court erred when it refused to charge the jury on the defense theories of self-defense and defense of others; (2) the trial court erred when it refused to charge the jury on the lesser-included offense of passion-provocation manslaughter; (3) the voir dire of prospective guilt-phase jurors was inadequate because the judge refused to determine that they were willing to accept the principles of presumption of innocence and reasonable doubt; and (4) ineffective assistance of trial counsel for (a) failure to call two witnesses with exculpatory testimony, (b) failure to obtain exculpatory evidence from forensic expert Professor Miller until the penalty phase of trial, when the trial judge excluded it.

## II.  <u>28 U.S.C. § 2254</u>

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context

14

where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein). In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)). "However, § 2254(e)(1) still mandates that the

state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d q158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);

16

United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),

cert. denied, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   The Motions to Expand the Record

Petitioner has filed two Motions [43, 45] to expand the
record.  More specifically, he wishes to add to the record the
following documents:  (1) an affidavit from Hugh Josephs, dated
Mach 6, 2012, in which he states that Petitioner was not present
in the city of Camden on January 22, 1995, at 3212 Federal
Street, when McLean died, (2) a letter from Petitioner's
appellate attorney, dated October 24, 2002, instructing
Petitioner that he must submit all state petitions for post-
conviction relief within five years, which Petitioner states is
the reason that he has not presented that affidavit of Hugh
Josephs to the state courts, (3) a letter from Petitioner's state
PCR counsel, dated October 12, 2005, reflecting that counsel
received a letter from Hugh Josephs's counsel indicating that he
did not want to provide a statement exculpating Petitioner in
this matter, which Petitioner submits as evidence that the
failure to obtain this evidence earlier was not the result of
neglect, (4) a letter from Petitioner's state PCR counsel to the
state PCR court, dated December 4, 2006, with an accompanying
affidavit from Carmeta V. Lindo, a social worker who was retained
to assist in the penalty phase of the trial, after Petitioner had

17

been convicted, stating that Petitioner's mother had informed her at that time that her older son, Junior, "had confessed to her at the time of the shooting that he was the one who committed the murders and that Daron was caught off guard," and that trial counsel had determined not to bring that information out at the <u>penalty</u> phase of the trial because Junior was still at large and it might affect Junior's ability to get a fair trial later, and (5) a later-executed duplicate of document (4).

Counsel for Respondents agrees that the 2006 letter from PCR counsel and attached affidavit of Carmeta V. Lindo were submitted to the state court in connection with Petitioner's state petition for post-conviction relief and were mistakenly omitted from the state court record supplied to this Court and, therefore, has no objection to the expansion of the record to include that affidavit.  The later-executed duplicate affidavit is redundant. The other documents (1), (2), and (3), above, were not a part of the state court record and Respondents object to expansion of the record to include those documents.

With respect to claims adjudicated on the merits by state courts, <u>see</u> 28 U.S.C. § 2254(d), as were all of Petitioner's claims here, the Supreme Court has explicitly held that federal courts are limited to consideration of the record that was before the state court that adjudicated the claim on the merits.  <u>See</u> <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398-1401 (2011).  Thus,

this Court will not permit expansion of the record to include the other documents proffered by Petitioner.

Even if Petitioner's claims were not claims decided on the merits by the state courts,[2] Petitioner has not met the threshold for expansion of the record permitted under 28 U.S.C. § 2254(e)(2), which permits an evidentiary hearing only in limited circumstances.

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> > (A) the claim relies on--
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; <u>and</u>
> >
> > (B) <u>the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error no reasonable factfinder would have found the applicant guilty of the underlying offense</u>.

28 U.S.C. § 2254(e)(2) (emphasis added).

Certainly, here, Petitioner has failed to establish that the facts underlying his claims are sufficient to establish by clear

---

[2] In <u>Cullen</u>, the Supreme Court noted that Section 2254(e)(2) "still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court."  131 S.Ct. at 1401.

and convincing evidence that, but for constitutional error, no reasonable factfinder would have found Petitioner guilty of the offenses.  The two affidavits are insufficient to overcome the substantial evidence of guilt recited by the Supreme Court of New Jersey in its opinion, quoted at length above.  Significantly, the affidavit indicating that Petitioner was not in town that evening is contradicted by the testimony of the victim that Emil was present in the apartment and had attacked him with a knife, earlier in the evening, being disarmed by McLean, who was later killed.  Also, multiple witnesses spoke of seeing and/or hearing two individuals fleeing the apartment, including one who heard someone exhorting "Dee" (Petitioner's nickname) to hurry. Therefore, this Court will deny the request to expand the record, except as to the 2006 letter and affidavit that were mistakenly omitted from the state record provided by Respondents.

B.   <u>Jury Selection</u>

Petitioner asserts that the voir dire of the potential guilt-phase jurors was defective because the trial court refused to determine that the jurors were willing to accept the principles of presumption of innocence and reasonable doubt.

The Supreme Court of New Jersey rejected this claim on direct appeal.

> Finally, we note that defendant argues that the jury voir dire for the guilt-phase proceedings was inadequate in several respects. Specifically, defendant maintains that the trial court erred by failing to ask

prospective jurors whether they would accept the
principles of presumption of innocence and reasonable
doubt. Defendant argues that such inquiries are
essential to determine whether the prospective jurors
would hold the State to its burden of proof during
deliberations.

Jury fairness and impartiality takes on added
significance in capital cases. State v. Williams, 93
N.J. 39, 61, 459 A.2d 641 (1983) ( Williams I ). We
have emphasized the importance of the voir dire
examination of prospective jurors to reveal potential
and latent biases. State v. Williams, 113 N.J. 393,
409–10, 550 A.2d 1172 (1988) ( Williams II ). However,
trial courts are allowed broad discretion to assess the
qualification of jurors, the exercise of which "will
ordinarily not be disturbed on appeal." State v.
Jackson, 43 N.J. 148, 160, 203 A.2d 1 (1964), cert.
denied, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572
(1965); Ramseur, supra, 106 N.J. at 256–57, 524 A.2d
188 ("Of necessity, a sound measure of discretion must
be reposed in our trial courts to determine whether a
given juror can well and truly discharge the grave
responsibility entrusted.").

Two of defendant's proposed questions were
rejected by the trial court. The first pertained to the
prospective juror's ability to presume defendant's
innocence despite the fact that defendant had been
charged with three murders. The second question focused
on the juror's ability to hold the prosecution to its
burden of proof even if the juror personally believed
that defendant was guilty. The trial court declined to
present those questions because presumption of
innocence and burden of proof would be adequately
addressed in the court's jury instructions and in the
court's general voir dire question: whether the jurors
could follow the law as charged. Nevertheless, the
trial court did agree to ask the jurors whether they
could set aside any personal feelings in a case
involving three murders.

The trial court instructed the assembled
prospective jurors and the jury selected on the
presumption of innocence and the burden of proof. The
court also probed each juror concerning whether he or
she would have difficulty setting aside personal
feelings in a case involving three murders. When one

> prospective juror indicated that he would hold it
> against defendant if he elected not to testify, the
> court asked whether he could not set aside that bias in
> light of the court's instructions on the defendant's
> right not to testify and the State's burden of proof
> beyond a reasonable doubt. When the juror responded
> that he would hold defendant's failure not to testify
> against defendant "if it was close," the court promptly
> excused the juror.
>
> Based on an examination of the record, we find no
> abuse of discretion in the trial court's rejection of
> defendant's request to question individually
> prospective guilt-phase jurors on their willingness to
> accept the presumption of innocence and the State's
> burden of proving guilt beyond reasonable doubt.
> Although we encourage trial courts to be "sensitive to
> permitting attorneys to conduct some voir dire," State
> v. Biegenwald, 106 N.J. 13, 30, 524 A.2d 130 (1987), we
> note here that the trial court adopted the majority of
> the voir dire questions submitted by defendant. The
> decision to omit two of eight questions was well within
> the trial court's discretion. Further, the instructions
> to the prospective jurors and the deliberating jurors
> were sufficient to ensure that the jury was impartial
> and could follow the law as charged.

State v. Josephs, 174 N.J. 44, 104-105 (2002).

The Sixth Amendment to the U.S. Constitution secures to a

criminal defendant the right to trial "by an impartial jury."

Thus, "while impaneling a jury the trial court has a serious duty

to determine the question of actual bias, and a broad discretion

in its rulings on challenges therefor. ... In exercising its

discretion, the trial court must be zealous to protect the rights

of an accused." Dennis v. United States, 339 U.S. 162, 168

(1950). Nevertheless,

> No hard-and-fast formula dictates the necessary depth
> or breadth of voir dire. See United States v. Wood,
> 299 U.S 123, 145-146, 57 S.Ct. 177, 81 L.Ed. 78 (1936)

22

> ("Impartiality is not a technical conception.  It is a
> state of mind.  For the ascertainment of this mental
> attitude of appropriate indifference, the Constitution
> lays down no particular tests and procedure is not
> chained to any ancient and artificial formula.")  Jury
> selection, we have repeatedly emphasized,  is
> "particularly within the province of the trial judge."

Skilling v. U.S., 130 S.Ct. 2896, 2917-18 (2010) (citations
omitted).

The Supreme Court has noted that, from its "lofty" and
"panoramic" vantage point, "lines of voir dire inquiry that
'might be helpful in assessing whether a juror is impartial' are
not hard to conceive."  Skilling, 130 S.Ct. at 2918, n.20
(citation omitted).  "'To be constitutionally compelled, however,
it is not enough that such questions might be helpful.  Rather,
the trial court's failure to ask these questions must render the
defendant's trial fundamentally unfair.'"  Id. (quoting Mu'Min v.
Virginia, 500 U.S. 415, 425-26 (1991)).

The decision of the state court that the voir dire was
sufficient to seat an impartial jury was neither contrary to nor
an unreasonable application of controlling Supreme Court
precedent, nor was the decision based on an unreasonable
determination of the facts in light of the evidence presented.
Petitioner is not entitled to relief on this claim.

C.   Jury Instructions

Petitioner asserts that he was deprived of a fair trial by
the trial court's refusal to charge the jury with respect to

23

certain defense theories including self-defense, defense of others, and passion/provocation manslaughter.

At a charge conference, counsel for Petitioner requested instructions on self-defense and defense of others, as well as on lesser-included offenses of aggravated manslaughter, reckless manslaughter, and passion-provocation manslaughter. In support of these requests, counsel relied upon the neighbor's testimony regarding "thumping" noises that preceded gunfire, as well as evidence that McLean was beaten with an iron. Petitioner argued that these facts were evidence of a struggle, that McLean might have had a gun, that there might have been a struggle over the gun, that McLean might have pointed the gun at somebody, that the iron might have been used to subdue McLean and take the gun from him. Defense counsel also argued that Mitchell may have picked up a gun and that either McLean or Mitchell might have pointed a gun at Petitioner or somebody else. After considering these arguments, the trial court agreed to charge the jury on aggravated and reckless manslaughter, but denied the other requests as being based upon "pure conjecture," because there was no evidence to show justification for the use of force against the victims and no evidence to show that Petitioner believed force was immediately necessary to protect himself or others.

The Supreme Court of New Jersey rejected Petitioner's claims on direct appeal.

24

Defendant's final contentions concern the denial
of his request for a charge on self-defense, defense of
others, and the lesser-included offense of
passion/provocation manslaughter. The trial court
declined to give those charges because they were
unsupported in the record.

a. Self-Defense/Defense of Others

The use of force against another in self-defense
is justified "when the actor reasonably believes that
such force is immediately necessary for the purpose of
protecting himself against the use of unlawful force by
such other person on the present occasion." N.J.S.A.
2C:3-4a. Self-defense requires an actual, honest, and
reasonable belief by the defendant of the necessity of
using force. <u>State v. Kelly</u>, 97 N.J. 178, 198-99, 478
A.2d 364 (1984). The reasonableness of the defendant's
belief is determined by the jury, using an objective
standard of what a reasonable person in the defendant's
position would have done at the time the force was
used. <u>Id.</u> at 199-200, 478 A.2d 364. The jury is not
required to find beyond a reasonable doubt that the
defendant's belief was honest and reasonable. <u>Id.</u> at
200, 478 A.2d 364. Rather, "if any evidence raising the
issue of self-defense is adduced, either in the State's
or the defendant's case, then the jury must be
instructed that the State is required to prove beyond a
reasonable doubt that the self-defense claim does not
accord with the facts." <u>Ibid.</u>

For a defense of others charge, it must be shown
that "the use of force upon or toward the person of
another is justifiable to protect a third person when
... [t]he actor would be justified under section 2C:3-4
in using such force to protect himself against the
injury he believes to be threatened to the person whom
he seeks to protect." N.J.S.A. 2C:3-5a(1). The defense
is applicable if the defendant reasonably believed
"that the person he sought to aid was unlawfully
attacked and that the force used was necessary to
protect the person from the attack." <u>State v. Bryant</u>,
288 N.J.Super. 27, 35, 671 A.2d 1058 (App.Div.),
<u>certif. denied</u>, 144 N.J. 589, 677 A.2d 761 (1996).
Similar to the self-defense doctrine, the trial court
is required to instruct on defense of another if there
is a rational basis in the record to support it. <u>State
v. Doss</u>, 310 N.J.Super. 450, 458-60, 708 A.2d 1219

(App.Div.), <u>certif. denied</u>, 155 N.J. 589, 715 A.2d 992 (1998).

To support his claim to the charges, defendant cites to several parts of the record: Emil's testimony that tensions had been mounting in the apartment; the testimony of Fonceta Young and Joyce Poole, the two neighbors who heard "thumping" noises and who thought that "some guys" in the apartment were "wrestling," "playing around," or fighting before the shootings occurred; and the fact that McLean had been beaten with a steam iron before he was shot as indicating that McLean either threatened or attacked defendant causing defendant to pick up the iron and use it in self-defense.

Defendant's recitation of the evidence would require a jury to make several inferences: that the sounds heard by the neighbors were fights, that one of the victims was the aggressor, that defendant was provoked into attacking the victim, and finally that deadly force was necessary to protect defendant or another person. Defendant failed to point to any facts that provide a rational basis from which a jury could reasonably infer that he acted in self-defense or in defense of another. The trial court did not err by declining those charges.

### b. Passion/Provocation

Defendant's contention concerning the trial court's denial of a passion/provocation manslaughter charge suffers from similar infirmities. Murder is reduced to manslaughter if the murder is committed in the heat of passion in response to a reasonable provocation. N.J.S.A. 2C:11-4b(2). Passion/provocation manslaughter has four elements: (1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying. <u>State v. Mauricio</u>, 117 N.J. 402, 411, 568 A.2d 879 (1990). The first two elements of the offense are objective; thus, if they are supported by the evidence, the trial court should instruct the jury on passion/provocation manslaughter, leaving the determination of the remaining elements to the jury.

State v. Robinson, 136 N.J. 476, 491, 643 A.2d 591
(1994).

        In support of the passion/provocation manslaughter
claim, defendant theorizes that based on the neighbors'
testimony of possible wrestling or fighting before the
shootings, a fight broke out between defendant and
Junior and the victims after Junior attempted to shoot
Emil. Under that version of events, defendant claims he
had little time to cool off as a result of the
provocation. Further, defendant submits that Emil,
McLean, or Mitchell may have threatened defendant with
a weapon, which also would have added to the adequacy
of the provocation.

        Although mutual combat may constitute adequate
provocation, State v. Crisantos, 102 N.J. 265, 274, 508
A.2d 167 (1986), defendant's suggestions of "mutual"
combat are nothing more than rank speculation and are
unsupported by the record. We find no basis on which to
overturn the trial court's refusal to give a
passion/provocation manslaughter charge that lacked a
rational basis in the record.

State v. Josephs, 174 N.J. 44, 101-104 (2002).

        Generally, questions relating to jury instructions are

matters of state law not cognizable in federal habeas review.

See Engle v. Isaad, 456 U.S. 107 (1982); Henderson v. Kibbe, 431

U.S. 145 (1977).  Thus, even a jury instruction that is

inconsistent with state law does not necessarily merit federal

habeas relief.

        Where a federal habeas petitioner seeks relief based upon

the jury instructions given in a state criminal proceeding,

        [t]he only question for us is "whether the ailing
        instruction by itself so infected the entire trial that
        the resulting conviction violates due process."  It is
        well established that the instruction "may not be
        judged in artificial isolation," but must be considered
        in the context of the instructions as a whole and the

                                    27

> trial record.  In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).

The Due Process Clause is violated where "the erroneous

instructions have operated to lift the burden of proof on an

essential element of an offense as defined by state law."  Smith

v. Horn, 120 F.3d 400, 416 (1997).  See also In re Winship, 397

U.S. 358, 364 (1970) ("the Due Process Clause protects the

accused against conviction except upon proof beyond a reasonable

doubt of every fact necessary to constitute the crime with which

he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979)

(jury instructions that suggest a jury may convict without

proving each element of a crime beyond a reasonable doubt violate

the constitutional rights of the accused).

Where such a constitutional error has occurred, it generally

is subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d

at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).

"[I]f the [federal habeas] court concludes from the record that

the error had a 'substantial and injurious effect or influence'

on the verdict, or if it is in 'grave doubt' whether that is so,

28

the error cannot be deemed harmless." Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).

In Beck v. Alabama, 447 U.S. 625, 635 (1980), the Supreme Court held that, in a capital case, a trial court must give a requested charge on a lesser included offense if it is supported by the evidence. The Court left open the question of whether instructions on lesser included offenses were required in non-capital cases. Id. The Court of Appeals for the Third Circuit has applied Beck in non-capital cases. See Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3d Cir. 1988) (citing Keeble v. United States, 412 U.S. 205, 212-13 (1973)). But see Geschwendt v. Ryan, 967 F.2d 877, 884 n.13 (3d Cir.) (observing that the Supreme Court, in Schad v. Arizona, 501 U.S. 624 (1991), cast doubt on the theory that due process always requires the court to instruct on a lesser included offense in non-capital offenses by applying a harmless-error standard; conviction of an offense two rungs higher up the ladder is a reliable indicator that a jury would not have convicted of the least included offense that was not charged), cert. denied, 506 U.S. 977 (1992). Other circuits have held that the failure to give lesser included offense instructions in a non-capital case does not present a constitutional question. See Pitts v. Lockhart, 911 F.2d 109, 112 (8th Cir. 1990), cert. denied, 501 U.S. 1253 (1991); Bonner v. Henderson, 517 F.2d 135, 136 (5th Cir. 1975).

Here, the state courts found that the evidence did not support Petitioner's requested lesser-included offense instructions.  That decision was neither contrary to nor an unreasonable application of <u>Beck</u>.  Accordingly, Petitioner is not entitled to relief on the claim that he was entitled to a jury instruction on the lesser-included offense of passion/provocation murder.

With respect to Petitioner's assertion that he was entitled to an instruction on self-defense or defense of others, the Supreme Court has held that states may place on defendants the burden of proving affirmative defenses.  <u>See</u> <u>Gilmore v. Taylor</u>, 508 U.S. 333, (1993).  Thus, the New Jersey rule, that an instruction on self-defense or defense of others must be given if there is any evidence supporting such a defense, comports with due process.  Here, the state court determination that Petitioner was not entitled to the requested instructions, because there was no evidence that could provide the jury a rational basis to substantiate the defense, is neither contrary to nor an unreasonable application of controlling Supreme Court precedent.  Nor is the state court decision based on an unreasonable determination of the facts based on the evidence presented.  Petitioner is not entitled to relief on these claims.

D.   Assistance of Counsel

Petitioner asserts that his trial counsel provided constitutionally defective assistance in two particulars:  (a) failure to call two witnesses with exculpatory testimony, (b) failure to obtain exculpatory evidence from forensic expert Professor Miller until the penalty phase of trial, when the trial judge excluded it.

On direct appeal, challenging his death sentence, Petitioner challenged the exclusion of the expert testimony at the penalty phase of the trial, and the Supreme Court of New Jersey upheld the exclusion.

> Defendant contends that the trial court erred in excluding from the penalty-phase criticism of the State's physical evidence, thereby depriving the jury of the ability to consider "residual doubt" in its sentencing decision. Prior to commencement of the penalty trial, the court heard argument on the State's motion to exclude the proposed testimony of a forensic scientist who was hired by defendant to evaluate the physical evidence and to present a crime scene reconstruction for the jury. Defendant sought to call the forensic scientist to illuminate the inadequacies in the State's crime-scene processing and evidence collection. Defendant intended to rely on that testimony with respect to the circumstances of the crime and the State's burden to prove aggravating factor 4(g); to suggest defendant's lesser role in the crime from that of Junior's; and to establish a basis to support a passion/provocation jury charge.

> Because residual doubt concerning a defendant's guilt is not relevant to character or the circumstances of the offense, defendants do not have the right under the United States Constitution to have the jury instructed on residual doubt as a mitigating factor. Franklin v. Lynaugh, 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155, 165-66 (1988) (O'Connor, J.,

31

concurring). The Eighth Amendment of the United States Constitution limits the penalty-phase jury in capital cases to consider, as a mitigating factor, evidence of "any aspect of a defendant's character or record and any of the circumstances of the offense." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978) (White, J., concurring in part and dissenting in part). Similarly, under the New Jersey Constitution, the proffered evidence must be relevant to the aggravating and mitigating factors; therefore, "[r]etrial of issues relevant only to guilt is not permitted." <u>Biegenwald</u>, <u>supra</u>, 106 N.J. at 71, 524 A.2d 130. Thus, "[w]hile defendant may lose whatever advantage inheres in the 'residual doubts' that the original jury may have had regarding defendant's guilt, the State may also lose whatever 'advantage' inheres in the emotional impact that often surrounds the initial guilt phase." <u>Biegenwald,</u> supra, 106 N.J. at 71, 524 A.2d 130 (citation omitted).

Defendant urges reconsideration of our prior decisions, seeking a holding that evidence of residual doubt is admissible at the penalty phase. We decline to do so and reaffirm the principle that the only evidence admissible in the penalty phase is evidence relevant to the aggravating and mitigating factors. Defendant also argues that he was improperly precluded from presenting evidence that was both critical of the aggravating factors and relevant to the circumstances of the offense. Because we are requiring the State to reprove the elements of murder to establish aggravating factor 4(g), defendant will have the opportunity to criticize the evidence presented in support of aggravating factor 4(g) and to present his own evidence relevant to the circumstances of the offense on retrial.

<u>State v. Josephs</u>, 174 N.J. 44, 115-116 (2002).

In his state petition for post-conviction relief, and here, Petitioner takes a slightly different approach, arguing that his trial counsel should not have waited till the penalty phase, but should have introduced this evidence during the guilt phase of the trial.  In addition, Petitioner asserts that his counsel was

32

constitutionally deficient for failing to call two exculpatory witnesses, Petitioner's mother and half-sister.  The trial court rejected Petitioner's claims and the Appellate Division affirmed the denial of relief.

In October 2003, defendant filed a PCR petition and counsel was assigned to represent him. Counsel argued that defendant's trial counsel had been ineffective for not presenting the testimony of defendant's mother and half-sister, who submitted certifications that Hugh Josephs had told them that defendant was not involved in the shootings. He also contended that trial counsel had been ineffective for not retaining a crime-scene reconstruction expert until the penalty phase of the trial. The trial court had disallowed that expert testimony, finding that it constituted an attempt to re-litigate the issue of defendant's guilt.

After hearing oral argument on defendant's petition, the trial court denied relief. This appeal followed. Defendant makes one argument on appeal-that the trial court erred in denying his petition.

To prevail on a claim of ineffective assistance of counsel a defendant must not only overcome a presumption that defense counsel's "conduct falls within the wide range of reasonable professional assistance," Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L. Ed.2d 674, 694 (1984), but defendant must also prove that counsel's performance was "deficient" and that "the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. at 2064, 80 L. Ed.2d at 693. See also United States v. Cronic, 466 U.S. 648, 653-58, 104 S.Ct. 2039, 2043-46, 80 L. Ed.2d 657, 664-67 (1984).

A defendant claiming incompetent representation must demonstrate first that counsel's performance was deficient, i.e., that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L. Ed.2d at 693. In addition, "[t]he defendant must show that there is a reasonable probability that, but

33

for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2064, 80 L. Ed.2d at 698. New Jersey has adopted this two-pronged standard. State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987).

The trial court pointed out during the argument that Hugh Josephs, who allegedly made these admissions, could not be located at the time of defendant's trial. Indeed, he was not apprehended until some years later, when he surrendered in Grenada. The trial court also pointed out that during Hugh Joseph's trial, his pre-trial statement, in which he claimed this defendant was responsible for the murders, directly contradicting what his mother and sister alleged he told them, was admitted into evidence. The trial court also noted that the expert report that had been excluded during the penalty phase of defendant's trial did no more than criticize the police for not preserving the crime scene correctly. The proffered testimony would not have served to exculpate defendant or to inculpate someone else.

At the conclusion of the argument, the trial court placed its oral opinion on the record. After setting forth the applicable legal standard by which defendant's petition must be measured, the trial court observed that the proffered testimony of defendant's mother and sister was inadmissible hearsay. It also stated that nothing within the expert's report would support a conclusion that if it had been presented during the guilt phase of the trial, the jury would have reached a different conclusion. It thus denied relief, finding no basis for a plenary hearing.

The order under review is affirmed substantially for the reasons stated by Judge John T. McNeill, III, in his oral opinion of January 18, 2007.

State v. Josephs, 2009 WL 417297, *1-*2 (N.J.Super. App.Div. Feb.

23, 2009), certif. denied, 200 N.J. 2006 (2009).

Here, the state courts correctly identified and applied the

controlling legal standard set forth in Strickland v. Washington.

Petitioner is not entitled to relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has not made a substantial showing of the denial of a constitutional right.  No certificate of appealability will be issued.

## V.  CONCLUSION

For the reasons set forth above, the Petition will be denied.  An appropriate order follows.


s/Renée Marie Bumb
RENEE MARIE BUMB
United States District Judge

Date:  September 27, 2012

35